```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
```

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| EARLE MCNEILL | : | No. 09-294-3 |

                            MEMORANDUM

Dalzell, J.                                       April 23, 2010

    This Memorandum will detail the reasons for our findings yesterday at defendant's sentencing that led to our sustaining the Government's objection to the Presentence Investigation Report (the "PSI") insofar as the PSI did not make a two-level upward adjustment for defendant's obstruction of justice pursuant to U.S.S.G. §3C1.1.  This will also explain in more detail our findings that this defendant's case was not "extraordinary" within the meaning of U.S.S.G. §3E1.1., Application Note 4, and therefore the defendant's offense level should not be reduced pursuant to §3E1.1(a) by two offense levels and under §3E1.19(b) for one additional level, both changes being premised upon this defendant's lack of acceptance of responsibility.  Lastly, we will highlight the factors under 18 U.S.C. § 3553(a) in accordance with our duty under <u>United States v. Booker</u>, 543 U.S. 220 (2005), and its progeny.

Background

It is undisputed that defendant Earle McNeill, who has a Doctorate in Psychology from Boston University and a Masters Degree in Clinical Social Work from the University of Pennsylvania, was the founder of a firm known as MultiEthnic Behavioral Health, Inc. ("MEBH"). MEBH was formed in 2000 to provide the City of Philadelphia Department of Human Services ("DHS") with social services to "at-risk" children in families under DHS's supervision. Specifically, MEBH contracted with DHS to provide what were known as "SCOH" ("Services to Children in their Own Homes") services to assure the safety and well-being of such "at-risk" children. The SCOH program was designed to assure that social services were indeed provided to such children who were deemed to be not so at risk that they should be removed from their family homes and placed in foster care.

MEBH provided these services to DHS from July of 2000 to October 31, 2006. Over the course of that time, MEBH received about $3.7 million for SCOH services supposedly afforded to over five hundred Philadelphia families. Ninety-five percent of the funds for these services came from the United States Department of Health and Human Services ("HHS"), which operates a program to provide Temporary Assistance for Needy Families ("TANF"), which

in turn makes block grants to the states. The Commonwealth of Pennsylvania received these TANF funds and then allocated them to municipalities around the Commonwealth. As it turned out, ninety-five percent of the funds paid to MEBH came from HHS under the TANF Program, four percent came from the Commonwealth, and one percent came from the City of Philadelphia.

After one of MEBH's charges -- a fourteen-year-old girl named D.K. -- was found dead and in horrific condition on August 4, 2006, a chain of events unfolded which from the date of the child's death involved a massive attempt by MEBH's officers and staff to cover up MEBH's failure to visit not only this victim's home, but those of many other of the families entrusted to MEBH. Notwithstanding this frantic effort -- which among other things involved the wholesale creation of backdated documents for family visits that never occurred -- and notwithstanding McNeill's energetic attempts to keep the DHS business, DHS ultimately terminated MEBH's contract effective October 31, 2006.

After articles appeared in the <u>Philadelphia Inquirer</u> about the wholesale failures that resulted in D.K.'s grisly death (she died of starvation and utter parental neglect, and though fourteen years old, weighed only forty-four pounds when her body was found), HHS Agent William McDonald persuaded his agency that

3

the matter was an appropriate subject for a formal HHS criminal investigation.[1]  Although many of the former MEBH officers and workers tried to thwart the HHS investigation, ultimately on April 30, 2009 a Grand Jury returned a twenty-one count Indictment against nine defendants -- McNeill among them -- charging wire fraud in violation of 18 U.S.C. §§ 1343 and 2 (Counts One through Twelve), health care fraud in violation of 18 U.S.C. §§ 1347 and 2 (Counts Thirteen through Eighteen), conspiracy to obstruct a matter within the jurisdiction of a federal agency in violation of 18 U.S.C. § 1519 (Count Nineteen), false statements to a federal agent in violation of 18 U.S.C. § 1001 (Count Twenty), and false declaration to a Grand Jury in violation of 18 U.S.C. § 1623 (Count Twenty-One).

Five of the defendants, including Earle McNeill, ultimately pled guilty to some of these charges.  The remaining four defendants went to trial on February 1, 2010 and on March 3, 2010 were convicted of most of the charges against them.  Four of the defendants who pled guilty cooperated with the Government and, at their sentencings this month, received motions under U.S.S.G. §

---

[1] Notably, Agent McDonald testified at trial that the <u>Inquirer</u> coverage triggered his investigation, <u>not</u> any report or notice from DHS.

5K1.1 based on their substantial assistance, which we granted. Defendant McNeill, however, did not cooperate, but did plead guilty to one count of wire fraud in violation of 18 U.S.C. §§ 1343 and 2.

As noted, we sentenced McNeill yesterday. We imposed a custodial term of ninety months, to be followed by three years of supervised release. We also obliged McNeill to pay $1,216,000 in restitution.[2] This sentence was within the advisory Guideline range of 87-108 months as a result of our determining a total offense level of **29** and a criminal history of **I**.

At the April 22 sentencing, there was a vigorous debate between the Government and the defense regarding whether McNeill

---

[2] Given the millions of dollars in public money involved here, restitution has been a major issue at all of the sentencings. In response to our Order of March 4, 2010, the Government and the City of Philadelphia reached an agreement wherein the City assigned whatever rights it had as a putative "victim" under the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A, to the Crime Victims Fund at the U.S. Treasury in accordance with 18 U.S.C. § 3664(g)(2). See Gov.'t Mem. regarding restitution at 10 (Doc. No. 242, Apr. 7, 2010), and Attachment A thereto (Apr. 7, 2010 ltr. from Christopher A. Iacona, Esq. to AUSA Bea L. Witzleben.) Shortly thereafter, the Commonwealth also assigned such rights it had as a victim to the Crime Victims fund. As a compromise given the complexities of calculating the restitution, the parties -- including all of the defendants sentenced to date -- have agreed to a sum of $1,216,000 as the proper restitution amount to be remitted to the Crime Victims Fund.

5

obstructed justice within the meaning of U.S.S.G. §3C1.1 by misleading Probation Officer Karen Myslinski into believing that he earned "$20,000 per year" (PSI ¶ 132) while Executive Director of MEBH, when he in fact knew that his income from MEBH was far in excess of that amount for each of the six years in which he received compensation from MEBH.

Obstruction of Justice

From the inception of McNeill's contact with federal investigators and throughout the prosecution of this matter, and notwithstanding his role as the founder of MEBH, McNeill has steadfastly taken the position that he was "more a figure-head than anything else" at the firm. Ct. Ex. 1 at 2 (Report of Interview by Agent Wm. McDonald and FBI Special Agent Greg Branch on Mar. 15, 2007 at McNeill's home in Philadelphia ("McDonald Report")).[3] As recently as April 20 of this year, McNeill's counsel contended in his sentencing memorandum that McNeill "was somewhat of a fringe figure or peripheral individual in this criminal scenario." Def.'s Mem. at 7.

---

[3] Agent McDonald testified at length about this Report of Interview at the sentencing hearing yesterday. Though offered the opportunity, McNeill did not challenge any aspect of Agent McDonald's testimony or the Report.

6

The record, however, belies McNeill's three-year pose to the Government and this Court about his supposed modest role in MEBH's operations and crimes. Indeed, a measure of how crucial McNeill was to MEBH will be found in Agent McDonald's Report which details McNeill's two post-D.K.-death attempts to convince then-DHS Commissioner Cheryl Ransom-Garner that she should not only continue MEBH's contract, but actually extend it. Agent McDonald's account of McNeill's conduct as late as October of 2006 bears quoting at length:

> SECOND MEETING WITH DHS COMMISSIONER RANSOM-GARNER
>
> - McNeill met with Kamuvaka after the first DHS meeting and found that Kamuvaka was friends with a (FNU) Volpe[4] who worked for the African Cultural Alliance in Philadelphia.
> - Kamuvaka told McNeill that Volpe was very politically connected with DHS and the Philadelphia City Counsel [sic].
> - McNeill met with Volpe and asked him to come to MEBH's second meeting with DHS Commissioner Ransom-Garner.
> - McNeill's idea was that Volpe would help MEBH get a "hand slap like the other agencies" and be required to submit a plan of correction to DHS.
> - Volpe attended the second meeting with McNeill. Ransom-Garner recognized Volpe and asked McNeill

---

[4] At the sentencing hearing, Agent McDonald admitted that he misheard this individual's name and that it was in fact Voffee Jabateh, who was, and apparently is, the Chief Executive Officer of the African Cultural Alliance of North America. As McNeill himself reported it to Agent McDonald, Voffee Jabateh was, at least in 2006, a powerful political figure in the City.

> > why Volpe was at the meeting. McNeill told
> > Ransom-Garner that Volpe was a friend of MEBH.
> - Ransom-Garner was upset that Volpe was at the meeting and wanted him dismissed.
> - Volpe stayed for the meeting.[5]
> - McNeill thought that MEBH would receive a "hand slap" and politics would fix the situation.

McDonald Report at 5.

This second meeting did not save MEBH's contract which, as noted, the City terminated effective October 31, 2006. McNeill on March 15, 2007 also mentioned to Agent McDonald that he and other Executive Council members made "from $35k to 50k in $5k increments during the past six years at MEBH." Id.

It was thus in this context that on February 2, 2010, McNeill reported compensation of $20,000 per year to Probation Officer Myslinski who was writing his PSI. As noted, McNeill's figure for his MEBH pay was duly recorded in PSI ¶ 132.

U.S.S.G. §3C1.1 provides:

> <u>Obstructing or Impeding the Administration of Justice</u>
>
> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B)

---

[5] It is evident from Mr. Jabateh's refusal to leave, and the Commissioner's acquiescence in that impertinence, that McNeill had indeed brought with him a potent political patron.

8

> the obstructive conduct related to (i) the
> defendant's offense of conviction and any
> relevant conduct; or (ii) a closely related
> offense, increase the offense level by **2**
> levels.

Among the "Examples of Covered Conduct" listed in Application Note 4 is subparagraph (h), which provides:

> <u>Examples of Covered Conduct.</u> -- The following
> is a non-exhaustive list of examples of the
> types of conduct to which this adjustment
> applies:
>
>     *        *        *
>
> (h)  providing materially false information to a
>      probation officer in respect to a presentence or
>      other investigation for the court[.]

McNeill's counsel at sentencing did not dispute that the provision of such "materially false information to a probation officer" could constitute §3C1.1 obstruction <u>if</u> his client really intended to mislead her. Indeed, as our Court of Appeals observed, any "statement to a probation officer concerning one's financial resources will obviously affect the officer's determination of ability to pay" the defendant's fine or restitution. <u>United States v. Cusumano</u>, 943 F.2d 305, 316 (3d Cir. 1991). That generalization about materiality is especially pointed here where the restitution obligation for many of these defendants exceeds $1.2 million.

9

The defendant in his allocution self-servingly stated that he had no such intention to mislead. Given his demeanor, education and extensive business experience, we found this claim to be incredible.

In the first place, it is clear from the record that McNeill in fact knew that he made between $35,000 and $50,000 per year when he worked for MEBH. Indeed, his W-2s documented that he made from $36,749 in 2003 to as high as $58,146 in 2005. <u>See</u> Ct. Ex. 2 (Gov't. Apr. 21, 2010 submission and attached W-2s). Defense counsel took refuge in the notion that on March 15, 2007 his client stated a (more or less) correct number to the Case Agent, and that he and his client could "assume" the Probation Officer would be aware of it.[6] In addition, counsel also sought refuge in the ultimate disclosure of McNeill's tax returns which eventually found their way to the Probation Officer, but most notably did <u>not</u> disclose McNeill's W-2 income from MEBH.[7]

---

[6] It is, obviously, a preposterous proposition that a Probation Officer can safely be assumed to know what is contained in every document created during federal investigations. In this matter, that number exceeds 500,000 pages. It is even more preposterous to assume the Court would have such knowledge, especially as to a defendant who did not go to trial.

[7] MEBH was not throughout the relevant period the only employer who supplied W-2s to McNeill. Thus, the number for each year's IRS Form 1040 for wages was always a sum of W-2s from such

Indeed, McNeill's MEBH W-2s only came to light after the Court signed an Order at the Government's request obliging the Internal Revenue Service to provide such information.

In any event, it is palpably extravagant to assume that a comment to a case agent in 2007 or a copy of an IRS 1040 <u>without</u> W-2s somehow satisfied McNeill's duty of candor to the Probation Officer when she was writing his PSI. There is no question here that, but for the Court's insistence, as well as its formal Orders, McNeill would have successfully hidden this ball. It is also worth mentioning that, notwithstanding the palpable error of ¶ 132 of the PSI, neither counsel[8] nor McNeill ever brought it to the Probation Officer's or the Court's attention.

And of course there was good reason for this. The essence of McNeill's defense was that he was a "fringe figure or peripheral individual", so much so that at one time McNeill through his counsel sought a "minor role" downward adjustment. Thus, when he disclosed to the Probation Officer an alleged income from MEBH that was as little as one-third of the reality, McNeill sought to convey that the modest compensation reflected

---

employers.

[8] Who is, after all, subject to Pa. Rule of Prof. Conduct 3.3.

11

his professed modest involvement.

The record, obviously, is directly to the contrary. Indeed, McNeill's vigorous effort to "help MEBH get a 'hand slap' like the other agency" from DHS <u>and</u> to extend the contract with DHS with the aid of his political ally, demonstrates that he was the go-to figure among the MEBH officers when the chips were really down.

The only reasonable inference on the totality of this record is that McNeill's material falsehood to Probation Officer Myslinski was calculated to fortify his defense that he was but a mere "figure-head". Such connivance is at the heart of what U.S.S.G. §3C1.1 and Application Note 4(h) address.

<u>Acceptance of Responsibility</u>

Having sustained the Government's objection with respect to a two-level enhancement under §3C1.1, Application Note 4 of U.S.S.G. §3E1.1 comes into play. This Application Note provides:

> Conduct resulting in an enhancement under §3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. There may, however, be extraordinary cases in which adjustments under both §§3C1.1 and 3E1.1 may apply.

It is well-settled that Application Note 4 does "not, <u>per</u> <u>se</u>,

12

require the District Court to refuse[] acceptance of responsibility." United States v. Batista, 483 F.3d 193, 198 (3d Cir. 2007).  Thus, we are presented with a fact-bound question of whether McNeill presents an "extraordinary case" within the meaning of Application Note 4.

It would, on this record, do violence to the English language to find that McNeill's case was "extraordinary",[9] at least in this benign sense.  Here there is nothing that a reasonable person could characterize as "extraordinary" to warrant the exception contemplated in Application Note 4.

McNeill did not cooperate with the Government, did not testify (as some of his co-defendants did) at the February-March trial, and his allocution displayed no cognition of the enormity of his crime.  To the contrary, the record confirms that McNeill believed the grisly photographs of D.K.'s body were "fabricated", McDonald Report at 2, and, worst of all, demonstrated that two months after D.K.'s horrid death he not only sought a "hand slap" from DHS, but actually sought the extension of MEBH's contract so that it could continue its mock services to the most vulnerable

---

[9] The Oxford English Dictionary defines extraordinary as "[o]f a kind not usually met with; exceptional; unusual; singular."  V The Oxford English Dictionary 614, def. 3 (2d ed. 1989).

13

members of the Philadelphia population.

It is important to note that we deferred ruling on the acceptance of responsibility question until the very end of the sentencing hearing, thereby affording McNeill the opportunity to "clearly" demonstrate such §3E1.1 acceptance. As it turned out, McNeill did not rise for his allocution until after a luncheon break, and thus he had ample time to confer with his seasoned attorney to articulate <u>something</u> upon which the Court could conclude that his was an "extraordinary" case within the benign contemplation of Application Note 4.

It is true that McNeill's allocution was noteworthy, but it was noteworthy for what he did not say. For example, there was no reference at all to any shame this defendant might feel for the waste of public dollars that he secured and maintained for so long. There was no allusion to the many families and at-risk children whom MEBH failed so abysmally. Most shocking of all, there was no reference of any kind to <u>his</u> responsibility in any way touching upon D.K. and her horrible and untimely demise.[10]

---

[10] While in his allocution McNeill claimed to be "outraged" at the sight of the photographs -- <u>pace</u> Agent McDonald's Report where he recorded McNeill's unchallenged statement that the photographs were "fabricated" -- his comments at his sentencing were addressed to Agent McDonald's Report but <u>not</u> to McNeill's participation in the wholesale fraud that made D.K.'s gruesome

14

In this last regard we can only conclude that when the chips were down in October of 2006 and on April 22, 2010, D.K. was for McNeill the ultimate inconvenient child.

We therefore declined to find that, within the meaning of U.S.S.G. §3E1.1, McNeill had "clearly" demonstrated acceptance of responsibility for his offense, or, much less, shown that his was the "extraordinary" case under Application Note 4 that warranted the grace of §3E1.1 notwithstanding his obstruction of justice.

Other Sentencing Factors

Of course, post-Booker, we begin with our assay to determine

---

death possible. This is hardly a distinction without a difference.

McNeill's reference in his allocution to his desire to make "a difference" through "reextending the contract to give our agency a chance to reconcile itself" can only, on this record, be regarded as a sick joke. As McNeill well knows, after D.K.'s death there was a frantic session on that very day to cook dozens of documents that were later faxed to DHS, and there is no record that at any time before October 31, 2006 McNeill ever chastised, much less fired, any MEBH employee because of dereliction of duty to clients like D.K.

Lastly, although in a letter three days before the sentencing hearing McNeill's lawyer conveyed the view that his client "is certainly experiencing both 'guilt' and remorse for his lack of vigilance and due diligence with respect to the monitoring and supervision of supervisors and employees who were directly responsible for attending to the needs of fragile children", Apr. 19, 2010 ltr. of Jeffrey Miller, Esq. to the Court, whatever (modest) force counsel's letter might have had was nullified by the actual words of his client under oath on April 22, 2010.

15

the applicable Guidelines range, Rita v. United States, 551 U.S. 338, 351 (2007), but then, in accordance with the teaching of Gall v. United States, 552 U.S. 38, 49-50 (2007), we must "consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party."

Applying this authority to McNeill's case, there was a sharp divergence of opinion as to what, precisely, McNeill's role in this massive and protracted healthcare fraud was. It is fair to say that while defendants Kamuvaka and Manamela were in charge of the day-to-day operations, McNeill was a member of MEBH's Executive Council and regularly attended Executive Council meetings. It is also fair to say that McNeill was the Alpha and Omega of this sordid drama. MEBH would not have existed without him, it kept going because of him, and when its existence was in jeopardy he was the fireman to whom Kamuvaka and the others turned. His role, therefore, was as the seniormost member of top management and the go-to person when MEBH's mortality was very much in jeopardy.

In terms of the seriousness of McNeill's relevant conduct, this, too, places him at the apex of reprehensibility. It beggars belief that two months after D.K.'s gruesome death McNeill did everything in his power not only to get a "hand slap"

16

for MEBH, but actually sought to perpetuate MEBH's contract so that these children could continue to be put at greater risk because of MEBH's fraud.  In short, it risks understatement to describe McNeill's performance in September and October of 2006 as appalling.

As the Government agreed at sentencing, in light of McNeill's behavior in September and October of 2006, the need to protect the public from further crimes from him is very much in play.  The artifice he attempted with the Probation Officer and with us demonstrates that he will not tell the truth even when it is palpably in his best interest to do so.  His resort to a political patron in October of 2006, especially in light of his successful pardon from the Governor of Delaware in 2003, demonstrates how successful this defendant can be at gaming the political system.  D.K.'s demise demonstrates what can happen when McNeill is successful at such games.

As we have mentioned in other sentencings in this matter, the need for general deterrence is particularly strong here. Organizations like MEBH and DHS exist, at least notionally, to protect the most vulnerable people in our society.  While anyone who enters this field has taken a step we should encourage, such social workers should know that if their ultimate actions do not

17

conform with their original intentions they will be severely punished.

Although the Government, in the end, invited our consideration of an upward variance, and while a strong case could well be made for such a variance in McNeill's case, we have not overlooked the fact that this defendant is a seventy-two-year-old man with serious medical conditions.  These realities as to this defendant's characteristics tempered the sentence we ultimately imposed.

                            BY THE COURT:

                            __\s\Stewart Dalzell